## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WILLIAM LEON BAUDERS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )      Case No. 17-CV-0209-CVE-FHM |
| | ) |
| SCOTT CROW,[1] | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

This matter is before the Court on the 28 U.S.C. § 2254 petition for writ of habeas corpus

(Dkt. # 2) filed by petitioner William Leon Bauders, a state inmate appearing through counsel.

Petitioner seeks federal habeas relief from the judgment and sentence entered against him in the

District Court of Tulsa County, Case No. CF-2014-78. Respondent filed a response (Dkt. # 8) urging

the Court to deny the petition and provided copies of records from petitioner's state-court

proceedings (Dkt. ## 8, 9, 10). Petitioner filed a reply (Dkt. # 11). On consideration of the materials

presented and the parties' arguments, the Court finds that this matter can be resolved without an

evidentiary hearing[2] and denies the petition for writ of habeas corpus.

---

[1]     Pursuant to FED. R. CIV. P. 25(d), the Court substitutes Scott Crow, Director of the Oklahoma
Department of Corrections, in place of Joe Allbaugh, the ODOC's former director, as party
respondent. The Clerk of Court shall note this substitution on the record.

[2]     This Court previously denied petitioner's request for an evidentiary hearing, noting that it
had not yet reviewed the record in this case. Dkt. # 4. Having now reviewed the record and
the parties' briefs, the Court finds that petitioner's claims can be resolved without an
evidentiary hearing.

### *BACKGROUND*

On January 1, 2014, petitioner drove a truck he knew had been stolen to a business that he knew would be closed for the holiday, broke through a locked gate, and drove away with a flatbed trailer that did not belong to him. Dkt. # 9-5, Tr. Trial vol. 4, at 41-43 [581-83], 67-68 [607-08].[3] William Rose, the owner of a nearby business, saw petitioner driving away with the trailer and suspected petitioner was stealing it. Dkt. # 9-3, Tr. Trial vol. 2, at 253-57 [336-40], 271 [354]. Rose and his girlfriend, Kathy Alsobrook, both of whom were in Rose's vehicle, followed petitioner. Id. at 255 [338], 257-59 [340-42]. As Rose was driving, Alsobrook called 911 to report the theft. Id. at 258-61 [341-44].

At some point, petitioner realized that Rose and Alsobrook were following him and he tried "to get away from them." Dkt. # 9-5, Tr. Trial vol. 4, at 45-48 [585-88], 69 [609]. The flatbed trailer came unhitched when petitioner temporarily lost control of the truck as he drove through a park near East 9th Street and Canton Avenue. Dkt. # 9-3, Tr. Trial vol. 2, at 258-61 [341-44]; Dkt. # 9-5, Tr. Trial vol. 4, at 49-50 [589-90]. Petitioner drove on without the trailer. Dkt. # 9-5, Tr. Trial vol. 4, at 50 [590]. Rose and Alsobrook continued following him and saw petitioner drive through several intersections without stopping at stop signs. Dkt. # 9-3, Tr. Trial vol. 2, at 260-62 [343-45]; Dkt. # 9-5, Tr. Trial vol. 4, at 51 [591]. As petitioner approached the intersection of East 9th Street and Richmond Avenue he was driving about 60-65 miles per hour. Dkt. # 9-5, Tr. Trial vol. 4, at 50 [590], 66 [606]. Petitioner failed to stop at the stop sign and his truck collided with a car being driven by Christina Bradshaw. Dkt. # 9-3, Tr. Trial vol. 2, at 196-99 [279-82], 218 [301],

---

[3]   For consistency, the Court's record citations refer to the CM/ECF header pagination. However, for citations to transcripts and the original record (O.R.), the Court also includes the original page numbers, in brackets, after the CM/ECF header page numbers.

264 [347]; Dkt. # 9-5, Tr. Trial vol. 4, at 9 [549], 51-52 [591-92].  Bradshaw was killed on impact. Dkt. # 9-4, Tr. Trial vol. 3, at 9-15 [372-78].  Petitioner's truck rolled over but landed upright against a nearby fence.  Dkt. # 9-3, Tr. Trial vol. 2, at 264 [347].  Petitioner crawled out the window of the truck and "took off running."  Dkt. # 9-4, Tr. Trial vol. 3, at 79-80 [442-43]; Dkt. # 9-5, Tr. Trial vol. 4, at 52-53 [592-93].  Several people who lived near the intersection went outside their homes after hearing the crash and saw petitioner running through the neighborhood and away from the accident. Dkt. # 9-4, Tr. Trial vol. 3, at 78-80 [441-43], 82-86 [445-49], 88-93 [451-56], 95-101 [458-64]. One of those onlookers saw petitioner take off and leave behind his jacket and other items of clothing as he ran from the neighborhood.  Id. at 95-101 [458-64].

Following an investigation, law enforcement officers arrested petitioner on the evening of January 2, 2014.  Dkt. # 9-5, Tr. Trial vol. 4, at 9-12 [549-52], 54 [594].  During the first part of a two-part interview with Sergeant Chris Witt and Officer Matt Rose, petitioner waived his Miranda[4] rights, denied involvement in the theft and fatal accident, and told the officers that his friends and neighbors agreed to identify him as the driver of the truck in exchange for drugs from his friend Kevin McGinnis.  Dkt. # 9-4, Tr. Trial vol. 3, at 151 [514], 154 [517], 158-64 [521-27]; Dkt. # 9-5, Tr. Trial vol. 4, at 12-13 [552-53], 21-22 [561-62]; see also State's Exhibit 99 (part one of

---

[4]   Miranda v. Arizona, 384 U.S. 436 (1966).  As the U.S. Supreme Court explained in Missouri v. Seibert, 542 U.S. 600, 608-09 (2004), "Miranda conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights:  failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.  Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."

petitioner's videotaped interview).[5]   After repeatedly confronting petitioner with the evidence against him, Witt ended the interview because petitioner "continued to deny" involvement and Witt felt the interview was not "getting anywhere."  Dkt. # 9-4, Tr. Trial vol. 3, at 164 [527].  Officer Rose took petitioner from the interview room to a holding area and, after completing some paperwork, spoke with petitioner for about 10-15 minutes.  Id.  at 164-65 [527-28]; Dkt. # 9-5, Tr. Trial vol. 4, at 13-15.  Rose then informed Witt that petitioner had agreed to resume the interview.  Dkt. # 9-4, Tr. Trial vol. 3, at 165 [528]; Dkt. # 9-5, Tr. Trial vol. 4, at 15 [555].  During the second part of the interview, petitioner admitted that he drove the stolen truck, that he stole the flatbed trailer, that he caused the accident that killed Bradshaw and that he left the scene of the accident.  Dkt. # 9-4, Tr. Trial vol. 3, at 165-66 [528-29]; Dkt. # 9-5, Tr. Trial vol. 4, at 22 [562]; see also State's Exhibit 99A (DVD depicting part two of petitioner's videotaped interview).  When Sergeant Witt asked petitioner why he had agreed to resume the interview, petitioner denied that Rose had threatened him to do so and told Witt that causing the accident was "weighing on him," that he could not sleep and that he "wanted to get it off his chest."  State's Ex. 99A, at 25:32-25:41, 26:05-26:09.  Petitioner further stated that neither officer made him any promises in exchange for his confession.  Id. at 30:45-31:24.  Later in the interview, petitioner stated that he was admitting the truth because he did not want people to think he was a "bad person" and because he felt remorse.  Id. at 32:33-32:55.

In an information filed January 10, 2014, in the District Court of Tulsa County, Case No. CF-2014-78, the State charged petitioner with second-degree felony murder (count 1), possession of a

---

[5]      Respondent conventionally filed the DVDs depicting both parts of the videotaped interview (State's Exhibits 99 and 99A).  Dkt. # 9-8, Trial Exhibits (part 2), at 44.

stolen vehicle (count 2), grand larceny (count 3), leaving the scene of a fatality collision, (count 4), and driving with a suspended license (count 5).  Dkt. # 9-9, O.R. vol. 1, at 27-28 [22-23].

Before trial, the trial court held a hearing, pursuant to Jackson v. Denny, 378 U.S. 368 (1964), to determine whether petitioner's statements could be admitted at trial.  Dkt. # 9-1, Tr. Hr'g, at 1-5.  After hearing testimony from Officer Rose and petitioner and viewing petitioner's videotaped interview, the trial court concluded the statements were voluntary and admissible.  Id. at 49-50.

The trial court also held an ex parte hearing with petitioner and trial counsel at counsel's request before trial.  Dkt. # 9-2, Tr. Trial vol. 1, at 28-32.  Trial counsel advised the court that he and petitioner "talked extensively about strategy for [the] trial," that they "decided to make it a sentencing trial," and that they "discussed making arguments for lesser includeds [sic] of felony murder." Id. at 28.  Counsel further advised the court that petitioner agreed that it was in his "best interest" to proceed with that strategy "given [his] confession." Id. at 28-29.  After noting that petitioner was under oath, the court confirmed counsel's statement through the following colloquy with petitioner:

> THE COURT: What [counsel is] telling me is that you have talked with him and his assessment is that the case is very strong against you.
>
> [Petitioner]: Yes, Your Honor.
>
> THE COURT: And that the State of Oklahoma will get a conviction.
>
> [Petitioner]: Yes, Your Honor.
>
> THE COURT: At least what he's telling me, he's saying the evidence is strong.  They can place you at the scene.  You've confessed.  What he says is that he thinks the best trial strategy is not to go in and deny it and put on a defense that I wasn't there or something to that effect.  He's saying that the best trial strategy for you is to basically admit responsibility and try to minimize the punishment that you receive.

5

[Petitioner]: Yes, Your Honor.

THE COURT: Is that the way you understand his statement to me?

[Petitioner]: Yes, Your Honor.

THE COURT: Have you had a chance to talk to him about this trial strategy?

[Petitioner]: Yes, Your Honor.

THE COURT: Do you agree with it?

[Petitioner]: Yes, Your Honor.

THE COURT: I've seen a few of these trials done and, if you agree with it, I would expect that your lawyer will be standing up very early in the proceedings and telling the jury that you're responsible for the death of this person.

[Petitioner]: Yes, Your Honor.

THE COURT: And once that's done, it's done, it's done.  If you have any doubt about this, this would be the time to tell me.

[Petitioner]: Yes, Your Honor.

THE COURT: Are you ready to proceed with the strategy that your lawyer has outlined and, that is, to admit responsibility and basically try to minimize the punishment?

[Petitioner]: Yes, Your Honor.

THE COURT: You've already told me that you're sober, clear-headed, and you understand what's going on.  Is that still the case?

[Petitioner]: Yes, Your Honor.

THE COURT: Are you under the influence of anything at all?

[Petitioner]: No, Your Honor.

THE COURT: Quite honestly, I don't know what lesser includeds [sic], if any will be applicable in this case and your attorney hasn't given me – at least requested lesser

included offenses, so I don't know if you will receive any lesser included offenses that the jury can consider or not. Knowing that, does that affect your decision here?

[Petitioner]: No, Your Honor.

THE COURT: Is there anything further that you want to put on the record, counsel?

[Trial counsel]: Nothing further for this record, Your Honor. I mean, if you would like me to sort of discuss what I anticipate being a possibility for us as far as lesser includeds [sic], I can do that.

THE COURT: No, I don't really need that now. The fact is, we'll be starting the trial and I don't really know what lesser includeds [sic] will be requested or what I'll give and it's – I don't usually know until I hear the evidence at trial. So what I'm saying is it's kind of an unknown that you're going to play this trial for minimization, to minimize the punishment and there is a lot of unknowns. That's the point I was trying to make. If you are comfortable with that and you still wish to pursue this line of defense, then I'll allow it. Is that what you want to do?

[Petitioner]: Yes, Your Honor.

THE COURT: Let's go off the record and be in recess.

Dkt. # 9-2, Tr. Trial vol. 1, at 29-32.

During opening statements, trial counsel admitted that petitioner did not "dispute that . . . he got into an accident, that he was driving that truck, and he hit and he killed Christina Bradshaw." Dkt. # 9-3, Tr. Trial vol. 2, at 177 [260]. The State presented testimony from Rose and Alsobrook, both of whom testified they saw petitioner steal the flatbed truck, reported the theft by calling 911 and followed him until the fatal collision. Dkt. # 9-3, Tr. Trial vol. 2, at 253-61 [336-44], 271 [354]. The State also presented testimony from several of the eyewitnesses who testified they lived near the intersection, heard the crash and saw petitioner crawl out of the truck and run away after the crash. Dkt. # 9-4, Tr. Trial vol. 3, at 78-80 [441-43], 82-86 [445-49], 88-93 [451-56], 95-101 [458-64]. In addition, the State presented evidence that McGinnis could be excluded as a major contributor of

DNA found on the items of clothing left behind by the driver of the truck, but petitioner could not be excluded as a major contributor of that DNA.  Dkt. # 9-4, Tr. Trial vol. 3, at 135-50 [498-513].  Finally, the State introduced both parts of petitioner's videotaped post-arrest interview, State's Exhibits 99 and 99A, and both were played for the jury in open court.  Dkt. # 9-5, Tr. Trial vol. 4, at 16-18 [556-558], 21 [561].

Petitioner was the only defense witness.[6]  He testified that he knowingly drove a stolen truck to a business where he intended to steal a flatbed trailer, that he cut the lock off the gate with bolt cutters and stole the trailer, that he was driving with a suspended license when he failed to stop at the stop sign at East 9th Street and Richmond Avenue, that he caused the collision that killed Bradshaw and that he discarded the items of clothing that were submitted for forensic testing as he ran from the scene of the accident.  Dkt. # 9-5, Tr. Trial vol. 4, at 42-54 [582-94], 76-81 [616-21].  Petitioner also testified that the first part of his interview "was a complete lie" and that he tried to blame McGinnis for the fatal crash because he "was scared of the consequences."  Id. at 55 [595].  When trial counsel asked petitioner why he ultimately told the officers the truth, petitioner testified, "I just couldn't hold it in no more, as in it was just eating at me for holding in the truth and just sitting there trying to base my life off lies."  Id.

At the jury instructions conference, trial counsel requested instructions on lesser-included-offenses of first degree manslaughter and negligent homicide, arguing that the jury could find him guilty of either offense.  Dkt. # 9-5, Tr. Trial vol. 4, at 87-88 [627-28].  Citing the evidence and testimony presented at trial, the trial court denied his requested instructions.  Id. at 88 [628].  During

---

[6]     Before petitioner testified, the trial court placed him under oath, questioned him and confirmed that petitioner decided to testify "freely and voluntarily."  Dkt. # 9-5, Tr. Trial vol. 4, at 31-36 [571-76].

closing arguments, trial counsel told the jury that the trial was "not about guilt or innocence" because petitioner "admitted to everything" and was "guilt[y] of every single charge." Dkt. # 9-6, Tr. Trial vol. 5, at 28 [661]. Counsel advised the jury that the sentencing range for second degree felony murder was 10 years to life and argued that a 15-year prison sentence would be a "just sentence" because petitioner was 31 years old, he had no prior felonies, he had a family, he did not intend to kill Bradshaw, and he accepted responsibility for his actions. Dkt. # 9-6, Tr. Trial vol. 5, at 28-43 [661-76].

At the conclusion of the trial, the jury found petitioner guilty as charged and recommended a life sentence (count 1), five years' imprisonment (count 2), ten years' imprisonment (count 4) and a $500 fine (count 5).[7] Dkt. # 9-6, Tr. Trial vol. 5, at 69-71 [702-04]. The trial court formally sentenced petitioner on December 8, 2014, adopted the jury's recommendations, and ordered the prison sentences to be served consecutively. Dkt. # 9-10, O.R. vol. 2, at 123-33 [307-18].

Represented by appellate counsel, petitioner filed a direct appeal in the Oklahoma Court of Criminal Appeals (OCCA), raising five propositions of error. Dkt. # 8-1, Appellant's Am. Br., at 2. In an unpublished summary opinion filed April 19, 2016, the OCCA denied each proposition on the merits and affirmed his convictions and sentences. Bauders v. State, Case No. F-2014-1064 (Okla. Crim. App. 2016) (unpublished) (hereafter, OCCA Op.), at 7. Petitioner did not seek further direct review by filing a petition for writ of certiorari in the United States Supreme Court. Dkt. #

---

[7]     The jury recommended a two-year prison sentence for the grand larceny conviction (count 3). Dkt. # 9-9, O.R. vol. 1, at 189 [184]. But because the grand larceny conviction was the underlying felony for the felony-murder conviction it merged with the murder conviction and the trial court dismissed count 3 during the formal sentencing hearing. Id. at 4-5 [1-2].

2, Pet., at 4.  Petitioner also did not file any applications for postconviction relief or other collateral review in state court.  Id.

Represented by the same attorney who represented hin on direct appeal in the OCCA, petitioner filed the instant federal habeas petition on April 18, 2017.  Dkt. # 2, Pet., at 1.  He seeks federal habeas relief on three of the five claims he asserted on direct appeal.  Id. at 4.

## *DISCUSSION*

### I.      **Legal framework**

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs this Court's review. Because petitioner is a state prisoner he cannot obtain federal habeas relief unless he shows that he "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  And because the OCCA adjudicated his federal claims on the merits, this Court may not grant habeas relief unless petitioner first demonstrates that the OCCA's adjudication of his claims "resulted in a decision that" either (1) "was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), (2) "involved an unreasonable application of clearly established Federal law," id., or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).  As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)); see also House v. Hatch, 527 F.3d 1010, 1015 (10th Cir. 2008) (explaining that "Supreme Court holdings—the exclusive touchstone for clearly established federal law—must be construed narrowly and consist only of something akin to on-point holdings").

"A state-court decision is only contrary to clearly established federal law if it 'arrives at a conclusion opposite to that reached by' the Supreme Court, or 'decides a case differently' than the Court on a 'set of materially indistinguishable facts.'"  Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting Williams, 529 U.S. at 412-13).  "A state court's decision unreasonably applies federal law if it 'identifies the correct governing legal principle' from the relevant Supreme Court decisions but applies those principles in an objectively unreasonable manner."  Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520 (2003)).  But "a state court's application of federal law is only unreasonable if 'all fairminded jurists would agree that the state court decision was incorrect.'"  Id. (quoting Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014)).  Lastly, "a state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'"  Wood, 907 F.3d at 1289 (quoting Byrd v. Workman, 645 F.3d 1159, 1170-72 (10th Cir. 2011)).  And, in considering a challenge to the state court's factual determination, a federal court must presume the correctness of the state court's factual findings unless the petitioner rebuts that presumption "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The standards set forth in § 2254(d) make it difficult, but not impossible, to obtain federal habeas relief on "claims already rejected in state proceedings."  Harrington v. Richter, 562 U.S. 86, 102 (2011).  This is by design because the federal remedy of habeas corpus is intended to be "a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Id. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

11

Moreover, even if a habeas petitioner satisfies § 2254(d)'s exacting standards, it does not necessarily follow that the petitioner is entitled to habeas relief. Rather, it merely permits the federal court to review the petitioner's federal claims de novo, without deference to the state court's decision. Milton v. Miller, 744 F.3d 660, 670-71 (10th Cir. 2014). If the federal court finds a constitutional error on de novo review, it then "must assess the prejudicial impact of [that] constitutional error . . . under the 'substantial and injurious effect' standard set forth in Brecht [v. Abrahamson, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness." Fry v. Pliler, 551 U.S. 112, 121-22 (2007). Under the Brecht standard, a federal court will grant habeas relief only if it "is in grave doubt as to the harmlessness of an error that affects substantial rights." O'Neal v. McAninch, 513 U.S. 432, 445 (1995).

With this legal framework in mind, the Court turns to petitioner's claims.

## II.    Analysis

Petitioner seeks federal habeas relief on three of the five claims he presented to the OCCA on direct appeal. First, he claims that the trial court violated his Fifth Amendment right against self-incrimination by erroneously admitting at trial the involuntary and coerced statements he made during the second part of his post-arrest interview (claim one). Dkt. # 2, Pet., at 12-18. Second, he claims that the trial court deprived him of his Sixth and Fourteenth Amendment rights to a fair trial and due process by denying his request for lesser-included-offense instructions (claim two). Id. at 18-21. Third, he claims that he was deprived of his Sixth Amendment right to the effective assistance of counsel because trial counsel persuaded him to concede guilt at trial and ask the jury for leniency but counsel failed to investigate and present mitigating evidence to support his request for a lesser sentence (claim three). Id. at 21-24.

12

Respondent concedes, and the Court finds, that petitioner timely filed his habeas petition, see 28 U.S.C. § 2244(d)(1)(A), and exhausted claims one and two by presenting them to the OCCA on direct appeal, see id. § 2254(b)(1)(A).  Dkt. # 8, Resp., at 2.  Respondent contends that a portion of claim three is unexhausted, but urges the Court to deny claims one and three on the merits because 28 U.S.C. § 2254(d) bars relief on both claims.  Id. at 2, 15-21, 26-36.  Respondent contends that claim two should be denied because there is no clearly established federal law requiring the giving of lesser-included-offense instructions in noncapital cases.  Id. at 21-22.  Alternatively, respondent contends that even if claim two alleges a cognizable due-process claim petitioner is not entitled to federal habeas relief because the alleged error did not deprive petitioner of his fundamental right to a fair trial.  Id. at 22-26.

### A.      Claim one:  admission of interview statements

Petitioner first claims that the State violated his Fifth Amendment right against self-incrimination by admitting at trial the incriminating statements he made during the second part of his post-arrest interview.  Dkt. # 2, Pet., at 12-18.  He alleges his statements were involuntary because the interview was "long and extensive," it occurred "late at night," "he was exhausted," he "had been deprived of sleep" and coerced because Officer Rose used a "psychological ploy" of feigned friendliness and a false promise of leniency to persuade petitioner to return to the interview room for the second part of the interview.  Id.; Dkt. # 11, Reply, at 3-4.

Under clearly established federal law, the admissibility of a confession turns on whether, under the totality of the circumstances, the defendant's statements were voluntarily made.  Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973); Carter v. Bigelow, 787 F.3d 1269, 1295 (10th Cir. 2015).  If the defendant's "will has been overborne and his capacity for self-determination

critically impaired," then his incriminating statements are involuntary and inadmissible. <u>Bustamonte</u>, 412 U.S. at 225-26 (quoting <u>Columbe v. Connecticut</u>, 367 U.S. 568, 602 (1961)). Conversely, if the defendant's incriminating statements are "the product of an essentially free and unconstrained choice," then those statements are voluntary and admissible.  <u>Id.</u> at 225 (quoting <u>Columbe</u>, 367 U.S. at 602).  In applying the totality-of-the-circumstances test, a reviewing court must consider "both the characteristics of the accused and the details of the interrogation." <u>Bustamonte</u>, 412 U.S. at 226.  Relevant factors to consider "include the youth, intelligence, and education of the accused, whether he was read his rights, the 'repeated and prolonged nature of the questioning,' and the use of physical punishment."  <u>Carter</u>, 787 F.3d at 1295 (quoting <u>Bustamonte</u>, 412 U.S. at 226).  In addition, the reviewing court should consider whether law enforcement officers used promises of leniency or psychological coercion to obtain incriminating statements from the defendant.  <u>See</u> <u>Rodgers v. Richmond</u>, 365 U.S. 534, 540 (1961) ("[C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand."); <u>Sharp v. Rohling</u>, 793 F.3d 1216, 1229 (10th Cir. 2015) ("Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." (quoting <u>Clanton v. Cooper</u>, 129 F.3d 1147, 1159 (10th Cir. 1997))).

Applying these legal principles, the OCCA rejected petitioner's challenge to the trial court's admission of his interview statements, stating,

> [a] voluntary confession is one which 'is the product of an essentially free and unconstrained choice by its maker.'  <u>Johnson</u>, 2012 OK CR 5, ¶ 14, 272 P.3d at 727; <u>Young v. State</u>, 2008 OK CR 25, ¶ 19, 191 P.3d 601, 607.  The State must show by

14

a preponderance of the evidence that a confession is voluntary, and the district court determines the issue by considering the totality of the circumstances. Young, 2008 OK CR 25, ¶ 19, 191 P.3d at 607.  On appeal, we determine whether competent evidence supports the district court's finding that the statement was voluntary. Id. As long as there are not threats or promises made, police may urge suspects to cooperate and to tell the truth. Underwood v. State, 2011 OK CR 12, ¶ 34, 252 P.3d 221, 239.  Even aggressive police questioning does not constitute coercion, where the record indicates a defendant answers questions voluntarily. Young, 2008 OK CR 25, ¶ 24, 191 P.3d at 608.  The record here does not support Bauders' claim that officers promised to have his charges dropped, or promised him anything else, in return for a confession; there is no merit to his claim that the officer's friendly attitude amounted to psychological coercion.

Dkt. # 8-3, OCCA Op., at 2-3.

Respondent contends that § 2254(d) bars relief on this claim, but petitioner disagrees. Petitioner argues that the OCCA's decision rests both on an unreasonable determination of the facts, under § 2254(d)(2), and on an unreasonable application of clearly established federal law, under § 2254(d)(1).  Dkt. # 2, Pet., at 12-17; Dkt. # 11, Reply, at 3-4.[8]

Having reviewed the state-court record, including both parts of petitioner's videotaped interview, the Court agrees with respondent that § 2254(d) bars relief on claim one.  The OCCA found that the trial court's factual findings were supported by substantial competent evidence and relied on those findings to conclude that petitioner's statements were voluntary and admissible.  Dkt.

---

[8]   Petitioner does not appear to argue, under § 2254(d)(1), that the OCCA's decision is contrary to clearly established federal law.  Dkt. # 2, Pet., at 12-18.  Nor could he prevail on that argument if he made it.  As respondent contends, even though the OCCA cited only state law in its analysis of petitioner's Fifth Amendment claim, the OCCA correctly identified the legal principles that govern that claim. Dkt. # 8, Resp., at 17; Dkt. # 8-3, OCCA Op., at 2-3; see Williams, 529 U.S. at 406 (discussing application of § 2254(d)'s "contrary to" clause); Webber v. Scott, 390 F.3d 1169, 1174 (10th Cir. 2004) ("Deference is accorded to a state court result even when the state court fails to discuss any federal law rationale for its decision or cite to any federal authority.").

# 8-3, OCCA Op., at 3.   The state-court record demonstrates that the OCCA both reasonably

determined the facts and reasonably applied the law.

As previously discussed, the trial court held a pretrial hearing to determine the admissibility

of petitioner's statements. Dkt. # 9-1, Tr. Hr'g, at 1-5.   At that hearing, Officer Rose testified that

petitioner's post-arrest interview began late in the evening, that the second part of the interview

lasted about 40-45 minutes, that petitioner appeared tired and upset but coherent during the

interview, that petitioner did not appear to be under the influence of alcohol or drugs, that neither

he nor Sergeant Witt drew a weapon or otherwise threatened or coerced petitioner to make a

statement, and that neither officer made any promises to petitioner in exchange for waiving his

Miranda rights.   Id. at 8-10, 14-17.   Rose further testified that after the first part of the interview

ended and he completed petitioner's paperwork he decided to "visit with" petitioner in the holding

area.   Id. at 11-12.   When asked at the hearing to "explain just the general outline of that

conversation," Rose testified:

> It was really one-sided to begin with. [Petitioner] was still, I believe, laying down
> kind of on the bench and I've got to wake him up to get his attention.  I told him man
> to man, you know, 'this is your arrest and booking sheet.'  I explained what it is.  I
> explained the charges that I had written on the front of the arrest and booking sheet,
> and I simply stated to him that I didn't think that this was the way that he wanted to
> go away from here.

Dkt. # 9-1, Tr. Hr'g, at 12.  According to Rose, petitioner appeared to be awake and listening to him

when Rose "just basically told him that [he] thought that [petitioner] had more to say."  Id.  at 13.

Rose also told petitioner that the officers "had evidence to believe that he did commit the crime and

that [Rose] didn't want him to go into county jail without at least giving [the officers] some type of

statement concerning the collision."  Id.  After speaking with Rose, petitioner agreed to return to the

16

interview room.  Dkt. # 9-1, Tr. Hr'g, at 13.  Rose testified that he did not force petitioner to resume the interview.  Id.

Petitioner also testified at the pretrial hearing.  He described his holding-area conversation with Officer Rose as follows:

> [Rose] came in there and he woke me up and was sitting there talking with me, basically telling me what all was going to happen, basically what I had been charged with and everything else.  You know, I told him, I said, "Man, that's a lot of charges to be facing with two kids, one on the way and a wife and family, you know, and everything else."  And he basically told me that, if I would go in there and tell them – basically admit guilt, that it would look better, not just for, one, in front of a jury of my peers, but also he could get the District Attorney to drop it down to vehicular manslaughter.

Dkt. # 9-1, Tr. Hr'g, at 40.  Petitioner testified that he understood Rose's statement about the district attorney to be a "promise" and testified that Rose said "he could get it done."  Id.  He further testified that Rose told him that vehicular manslaughter "didn't carry such a hefty – not hefty fine but hefty amount of time."  Id.  According to petitioner, his conversation with Rose prompted him to engage in the second part of the interview.  Id. at 40-41.  Petitioner also testified that he felt like Rose "promised to have something done" and that Rose's promise "coerced [him] into talking with [Rose]."  Id. at 41.

On cross-examination, the prosecutor asked petitioner whether he remembered when Sergeant Witt asked him, during the second portion of the interview, why he decided to resume the interview.  Dkt. # 9-1, Tr. Hr'g, at 41.  Petitioner testified that he lied when he told Sergeant Witt that he decided to resume the interview because he "had something more [he] had to tell him."  Id. at 41-42.  He also testified that he lied when he told Witt that Officer Rose had not promised him anything in exchange for his statement.  Id. at 42.  At the hearing, petitioner maintained that Rose

did, in fact, promise him that Rose would get the district attorney to reduce the murder charge to vehicular manslaughter.  Dkt. # 9-1, Tr. Hr'g, at 43.  After petitioner testified, the State called Officer Rose as a rebuttal witness.  Id. at 44.  Rose testified he made no promise to petitioner during the holding-area conversation that he would arrange for the district attorney to reduce the murder charge to vehicular manslaughter.  Id. at 44-47.

In addition to hearing testimony from Office Rose and petitioner, the trial court reviewed petitioner's videotaped interview.  Dkt. # 9-1, Tr. Hr'g, at 36-37.  During the first part of the interview, Sergeant Witt advised petitioner of his Miranda rights.  State's Ex. 99, at 22:56-22:59. Petitioner stated that he understood those rights and signed a written form waiving his rights.  Id. Petitioner told Witt that he was 30 years old, that he had completed school through the eighth grade, that he dropped out of school in ninth grade, and that he understood English.  Id. at 22:56-22:59, 23:21.  Petitioner also denied that he was under the influence of drugs or alcohol during the interview.  Id.  at 22:56-22:59.  During the second part of the interview, Witt asked petitioner why he had agreed to resume the interview after speaking with Officer Rose, and petitioner stated he "wanted to get it off his chest" and that Rose did not threaten him to resume the interview.  State's Ex. 99A, at 25:32-25:41, 26:05-26:09.  Petitioner also stated that neither officer made him any promises in exchange for his decision to resume the interview.  Id. at 30:45-31:24.  Later in the interview, petitioner stated that he was admitting the truth because he did not want people to think he was a "bad person" and because he felt remorse.  Id. at 32:33-32:55.

After hearing brief arguments and on the basis of the evidence presented at the hearing, including petitioner's videotaped interview, the trial court determined that petitioner's statements were voluntarily and admissible.  Dkt. # 9-1, Tr. Hr'g, at 49.  The court found that petitioner's

"confession" during the second part of the interview was the result of his "voluntary decision" to talk to the officers. Dkt. # 9-1, Tr. Hr'g, at 49.  Referring to the videotaped interview, the court found that petitioner "was asked repeatedly why he [decided to confess], and he said it's been weighing on him.  He can't sleep, he's not a killer, and it's been weighing on him.  The detectives gave him every opportunity to explain all of the reasons why he was making this statement and even then discussed at length, Sergeant Witt did, all of the things that happened while [Officer Rose and petitioner] were not on camera."  Id. at 49-50.  The court further found that Officer Rose's testimony was "credible and consistent with" the videotaped interview whereas petitioner's testimony was "directly inconsistent" with the statements he made during the second part of the interview as to why he decided to confess.  Id. at 50.

Because the transcript from the Jackson v. Denny hearing and the videotape of petitioner's interview fully support the factual underpinnings of the OCCA's decision and its legal conclusion that petitioner's statements were voluntary and admissible, § 2254(d) bars petitioner's request for habeas relief.  The Court therefore denies claim one.

### B.     Claim two:  refusal to give lesser-included-offense instructions

Next, petitioner claims that the State violated his Sixth Amendment right to a fair trial and his Fourteenth Amendment right to due process because the trial court refused his request to instruct the jury on the lesser-included-offenses of first degree manslaughter and negligent homicide.  Dkt. # 2, Pet., at 18-21.

Applying an abuse of discretion standard, the OCCA rejected petitioner's jury-instruction claim.  Dkt. # 8-3, OCCA Op., at 3.  Relying on state law, the OCCA stated that "[a] trial court should instruct on lesser included or related offenses that are supported by the evidence, asking

whether the evidence might allow a jury to acquit the defendant of the charged offense and convict him of the lesser offense." Dkt. # 8-3, OCCA Op., at 3.  The OCCA found that the record supported "the trial court's decision that evidence did not support instruction on either of [petitioner's] requested lesser offenses." Id.  The OCCA reasoned that petitioner "confessed, to the police and on the stand, to all the elements of second degree felony murder – he committed a homicide while engaged in the felony of grand larceny." Id.  It further reasoned that while there was some evidence in the record that may have supported his requested instructions, "jurors could not have believed that evidence and still acquitted [petitioner] of the charged offense of second degree felony murder." Id.

Respondent contends that petitioner is not entitled to habeas relief on claim two because there is no clearly established federal law requiring the giving of lesser-included-offense instructions in noncapital cases.  Dkt. # 8, Resp., at 21-22.  The Court agrees.  In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court "held that the death penalty may not be imposed 'when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Bobby v. Mitts, 563 U.S. 395, 397 (2011) (quoting Beck, 447 U.S. at 627).  But the Beck Court declined to "decide whether the Due Process Clause would require the giving of such instructions in a noncapital case."  447 U.S. at 638 n.14; see also Dockins v. Hines, 374 F.3d 935, 938 (10th Cir. 2004) ("The Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases, and neither has [the Tenth Circuit].").  Because Beck has not been extended to noncapital cases, the Tenth Circuit applies "a rule of 'automatic non-reviewability'" when, as here, the petitioner complains that lesser-included-offense instructions were not given in a noncapital case.  Dockins, 374 F.3d at 938; Chavez v. Kerby, 848 F.2d 1101, 1103 (10th Cir. 1988) ("[I]n [the Tenth] Circuit there is . . .

'automatic non-reviewability' of the lesser included offense argument as a basis for federal habeas corpus relief, regardless of whether the evidence was such as to support the giving of an instruction on a lesser included offense," in a noncapital case).  Because petitioner was neither charged with nor convicted of a capital offense, he fails to state a cognizable federal habeas claim arising from the OCCA's decision that the trial court did not abuse its discretion in denying his request for lesser-included-offense instructions.

Further, even if the Dockins rule did not automatically bar habeas review, § 2254(d)(1) bars habeas relief because, given that Beck does not apply in noncapital cases, petitioner cannot show that the OCCA's rejection of his jury-instruction claim was contrary to or an unreasonable application of clearly established federal law.  See Eizember v. Trammell, 803 F.3d 1129, 1144 (10th Cir. 2015) ("[U]nder AEDPA, [a federal] court is authorized to intervene only when state courts fail to apply the Supreme Court's existing and clearly established teachings reasonably, not when they fail to extend them in new and novel ways."); House, 527 F.3d at 1017 ("[T]he threshold determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis. That is, without clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law.").[9]

---

[9]  Petitioner does not appear to argue that the OCCA's decision on the alleged jury-instruction error rests on an unreasonable determination of the facts, under § 2254(d)(2). Dkt. # 2, Pet., at 18-21; Dkt. # 11, Reply, at 4-6.  And because petitioner is represented by counsel, the Court need not liberally construe his petition as making that argument.  See Hall v. Bellmon, 935 F.2d 1106, 1110 (1991) (providing that courts must liberally construe pleadings drafted by pro se litigants).  Petitioner instead appears to ask this Court to review the evidence de novo to determine whether lesser-included-offense instructions were warranted by the evidence.  Dkt. # 2, Pet., at 18-21; Dkt. # 11, Reply, at 4-6.  However, because the OCCA adjudicated his jury-instruction claim on the merits, this Court cannot employ de novo review unless and until petitioner satisfies the standards set forth in § 2254(d).  Milton, 744 F.3d at 670-71.  Petitioner fails to satisfy those standards for the reasons just discussed.

Finally, at least a portion of petitioner's argument could be read as asserting that the OCCA failed to properly apply state law when it rejected his jury-instruction claim.  See Dkt. # 2, Pet., at 19 (arguing, "Under Oklahoma law, a trial court should instruct on a lesser included or related offenses that are supported by the evidence that might allow a jury to acquit the defendant of a charged offense and convict him of the lesser offense"); Dkt. # 11, Reply, at 5 ("Looking to State law, a defendant is entitled to an instruction on all lesser included offenses sufficiently supported by the evidence.).  Under § 2254(a), "[i]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."  Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (emphasis in original).  Thus, to the extent petitioner argues that the OCCA failed to comply with state law when it determined that the evidence did not support his requested instructions, he fails to state a cognizable federal claim.

For these reasons, petitioner is not entitled to federal habeas relief on his jury-instruction claim.  The Court therefore denies claim two.

**C.     Claim three:  ineffective assistance of trial counsel**

In his third and final claim, petitioner contends that he was denied his Sixth Amendment right to the effective assistance of counsel, as interpreted in Strickland v. Washington, 466 U.S. 668 (1984).  Dkt. # 2, Pet., at 21-24; Dkt. # 11, Reply, at 6-8.  He alleges that trial counsel "unilaterally" decided to have him "admit [his] guilt and let the jury decide the punishment" and then "went against prevailing professional norms in not presenting any mitigating evidence."  Dkt. # 2, Pet., at 22-24.  Petitioner further alleges that trial counsel's deficient performance prejudiced him because "[h]ad trial counsel presented mitigating evidence at trial, the jury could have given [petitioner] a lesser sentence."  Id. at 24.

The Sixth Amendment guarantees a defendant's right to the assistance of counsel in criminal proceedings. Strickland, 466 U.S. at 686. And "effective assistance" is necessary "to ensure a fair trial." Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. To establish a Sixth Amendment violation, a defendant must demonstrate deficient performance and resulting prejudice. Id. at 687. "The proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." Id. at 688. And an attorney's deficient performance "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Thus, a defendant alleging general ineffectiveness "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693-94.

The Strickland standard, as applied on direct appeal, is "highly deferential." 466 U.S. at 689. The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. Under § 2254(d), habeas review of a Strickland claim that was adjudicated on the merits in state court is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105. And because "[t]he Strickland standard is a general one . . . the range of reasonable applications is substantial," making

it even more difficult for a habeas petitioner to show that the state court's application of Strickland was objectively unreasonable.  Richter, 562 U.S. at 105.

### 1.    Failure to exhaust

Preliminarily, respondent contends that the portion of claim three challenging counsel's failure to investigate and present mitigating evidence is not exhausted. Dkt. # 8, Resp., at 30-31. In his reply, petitioner asserts that he "raised and [the] OCCA examined whether counsel was ineffective in his trial strategy, including the presentation, or lack thereof, mitigation evidence. Thus, the claim was examined at the State level." Dkt. # 11, Reply, at 7.

The AEDPA generally "prohibits federal courts from granting habeas relief to state prisoners who have not exhausted available state remedies." Ellis v. Raemisch, 872 F.3d 1064, 1076 (10th Cir. 2017); see also 28 U.S.C. § 2254(b)(1).  To satisfy the exhaustion requirement, "a federal habeas petitioner [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." Grant v. Royal, 886 F.3d 874, 890 (10th Cir. 2018) (alteration in original) (quoting Anderson v. Harless, 459 U.S. 4, 6 (1982)).  This means, inter alia, that the "state-court claim must be the 'substantial equivalent' of its federal habeas counterpart." Id. at 891 (quoting Picard v. Connor, 404 U.S. 270, 278 (1971)); see, e.g., Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999) (holding that an ineffective-assistance-of-counsel claim was not exhausted when petitioner "raised an ineffective assistance of counsel claim on direct appeal [but] based it on different reasons than those expressed in his habeas petition").

Here, as respondent contends, the Sixth Amendment claim petitioner presents in his habeas petition differs from the claim he presented in the OCCA on direct appeal. Dkt. # 8, Resp., at 30-31. On direct appeal, petitioner alleged trial counsel was ineffective for failing to adequately

communicate with him, as required by Oklahoma Rules of Professional Conduct 1.4(a)(2), about

trial strategy and potential defenses.  Dkt. # 8-1, Appellant's Am. Br., at 22-23.  He further alleged

that the "only option" offered by trial counsel "was to try the case on punishment, and admit guilt."

Id. at 22.  Within this claim, petitioner also argued that because Oklahoma law does not permit "a

trial on punishment only," trial counsel "was ineffective for recommending that procedure to the

[trial court]."  Id. at 23-24.[10]

In his habeas petition, petitioner alleges that trial counsel "deviated from prevailing

professional norms" when he "unilaterally made the decision to have a 'sentencing trial'" and when

he failed to "present[] any mitigating evidence."  Dkt. # 2, Pet., at 22-24.  Focusing on the latter

failure, petitioner argues:

> Although trying a case for punishment purpose only is primarily employed in capital
> defense cases to warrant mitigation in sparing a human's life, trial counsel made the
> decision to employ such a tactic in this case.  However, while not entirely improper,
> the purposes of a punishment only trial is to provide the jury with some kind of
> mitigating offense to be considered for sentencing.  It is a prevailing professional
> norm that trial counsel would present mitigating factors to the jury such as  the
> defendant's background, education, employment record, mental and emotional
> stability, and family relationships."

Dkt. # 2, Pet., at 22-23.  Citing ABA standards applicable to capital cases and citing capital cases

from the U.S. Supreme Court and the OCCA, petitioner argues that trial counsel was ineffective for

failing to investigate potential mitigation evidence and for failing to present mitigating evidence at

trial.  Id. at 23-24; Dkt. # 11, Reply, at 6-8.  Petitioner further argues that "[t]rial counsel's decision

to beg the jury for mercy without giving any mitigating evidence or support that Mr. Bauders should

---

[10]     Petitioner also alleged in state court that trial counsel was ineffective for failing to object to
the verdict form as to count 1.  Dkt. # 8-1, Appellant's Am. Br., at 24.  The OCCA rejected
that portion of his Sixth Amendment claim, Dkt. # 8-3, OCCA Op., at 4-5, and petitioner
does not reassert it in his habeas petition, Dkt. # 2, Pet., at 22-24.

not have been convicted at the maximum extent the law allowed (life) goes against the prevailing professional norms in cases where the strategic decision to go to trial admitting guilt and ask the jury for mercy is employed." Dkt. # 2, Pet., at 24. Finally, he argues counsel's performance prejudiced him because, "[h]ad trial counsel presented mitigating evidence at trial, the jury could have given Mr. Bauders a lesser sentence." Id.

Based on the foregoing, the Court agrees with respondent that petitioner did not properly exhaust the portion of claim three challenging trial counsel's failure to investigate and present mitigating evidence. "Generally, a federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies." Grant, 886 F.3d at 891-92 (quoting Bland v. Sirmons, 459 F.3d 999, 1012 (10th Cir. 2006)). "However, dismissal . . . is not appropriate if the state court would now find the [unexhausted] claims procedurally barred on independent and adequate state procedural grounds." Id. at 892 (quoting Smallwood, 191 F.3d at 1267). Thus, if the federal court finds that a state court would apply a procedural bar to the petitioner's unexhausted claim, the federal court may apply an anticipatory procedural bar and deem the claim procedurally defaulted for purposes of habeas review. Id. And a federal court generally will not review a claim that has been procedurally defaulted unless the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law" or that a "fundamental miscarriage of justice" will result if the court does not review the claim. Coleman v. Thompson, 501 U.S. 722, 750 (1991).

The OCCA regularly imposes a procedural bar when a defendant seeks postconviction relief on the ground of ineffective assistance of trial counsel when that claim could have been, but was not, raised on direct appeal. See, e.g., Grant, 886 F.3d at 892; Cole v. Trammell, 755 F.3d 1142, 1158-59

(10th Cir. 2014) (discussing independent and adequate nature of OCCA's procedural bar as applied to ineffective-assistance-of-trial-counsel claims that could have been but were not raised on direct appeal).  The Court therefore finds it appropriate to apply an anticipatory procedural bar and deem procedurally defaulted that portion of claim three alleging trial counsel was ineffective for failing to investigate and present mitigating evidence.  Despite respondent's argument in his response that this portion of claim three is unexhausted, petitioner does not show in his reply any "cause and prejudice" to explain the procedural default.  Dkt. # 11, Reply, generally.  And the evidence from trial, including petitioner's own testimony, precludes application of the miscarriage-of-justice exception which requires "a colorable showing of factual innocence."  Marshall v. Jones, 639 F. Supp. 2d 1240, 1256 (N.D. Okla. 2009).  The Court thus denies the unexhausted portion of claim three under the procedural default doctrine.[11]

---

[11]    Even if petitioner did not procedurally default the portion of claim three alleging counsel was ineffective for failing to investigate and present mitigation evidence, it does not appear that he would be able to prevail under Strickland.  Under Strickland, a petitioner must show counsel performed deficiently and the deficient performance resulted in prejudice.  466 U.S. at 687.  Through the statements petitioner made during his post-arrest interview and through his trial testimony, the jury had evidence before it that petitioner was 30 years old, that he had completed school only through the eighth grade, that he was unemployed and "poor," that he had no prior felony convictions, that he lived with his wife and father, and that he was trying to regain custody of two of his children both of whom lived with their mother.  Dkt. # 9-5, Tr. Trial vol. 4, at 41 [581]; State's Exhs. 99, 99A.  And, during closing argument, trial counsel urged the jury to consider that evidence and impose a "just" punishment of a 15-year prison sentence.  Dkt. # 9-6, Tr. Trial vol. 5, at 28-43 [661-76].  Petitioner does not proffer any additional mitigation evidence trial counsel should have investigated or presented at trial.  Dkt. # 2, Pet., at 22-24.  On the record presented, even if the Court could overlook the procedural default, it does not appear that petitioner could show either deficient performance or prejudice as to counsel's alleged failure to investigate and present mitigation evidence.

### 2.      Sentencing-only trial strategy

Petitioner properly exhausted the portion of claim three challenging trial counsel's decision to advise petitioner to concede guilt at trial and ask the jury for a lenient sentence.  Dkt. # 8-1, Appellant's Am. Br., at 22-24.  Applying Strickland, the OCCA rejected petitioner's claim, finding that he failed to show either deficient performance or resulting prejudice.  Dkt. # 8-3, OCCA Op., at 4-6.  In doing so, the OCCA declined to "second-guess defense counsel's strategic decisions" and, relying on three of its own decisions in capital cases, stated that "[d]efense counsel may make the strategic decision to concede guilt, after consulting with a defendant and getting his consent."  Id. at 5-6.  The OCCA further stated,

> The record does not support Bauders' claim that trial counsel was ineffective for advising him to focus on punishment.  In addition to Bauders' own confession, overwhelming forensic and eyewitness evidence supported the charges.
>
> In a pretrial ex parte hearing, defense counsel discussed the strategy to focus on sentencing and the possibility of lesser included offenses at trial, rather than contesting Bauders' guilt.  The trial court entered into a long colloquy with Bauders, under oath, in which Bauders confirmed that he had talked with defense counsel about this strategy, understood it, agreed with it, and understood that counsel would tell jurors early on that he conceded guilt; Bauders also stated that he understood that he might not receive any lesser included offense instructions and still wanted to proceed with this strategy.  When Bauders confirmed his desire to testify on the record, he referred to it as "my testimony about admitting guilt" and stated that nobody had promised him anything or coerced his testimony.  Bauders understood and agreed with defense counsel's strategy.  He fails to show that, under the circumstances of this case, this strategy was unreasonable.  He also fails to show any reasonable probability that, had trial counsel advised him to contest guilt, the outcome of the trial would have been different.

Dkt. # 8-3, OCCA Op., at 6.

Because the OCCA applied Strickland, petitioner cannot show, under § 2254(d)(1), that the OCCA's decision was "contrary to" clearly established federal law.  Williams, 529 U.S. at 406.

And petitioner does not argue, much less demonstrate, that the OCCA's application of <u>Strickland</u> was objectively unreasonable under the particular facts of this case.  Dkt. # 2, at 22-24; Dkt. # 11, at 6-8.[12]  As the OCCA reasoned, petitioner's confession and the strong evidence against petitioner makes it difficult for petitioner to overcome the strong presumption that trial counsel's strategic decision to have petitioner concede guilt at trial was reasonable under the circumstances.  Dkt. # 8-3, OCCA Op., at 6; <u>see</u> <u>Strickland</u>, 466 U.S. at 689 (noting that a court reviewing counsel's performance under the Sixth Amendment "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").  Viewing the OCCA's decision with the double deference mandated by the AEDPA, the Court cannot say that the OCCA's application of <u>Strickland</u> was objectively unreasonable.

Further, to the extent petitioner's brief discussion in his petition of the pretrial <u>ex parte</u> hearing regarding trial strategy could be construed as an argument that the OCCA's decision is based on an unreasonable determination of the facts, <u>see</u> Dkt. # 2, Pet., at 22, the Court rejects that argument because the transcript from that hearing fully supports the OCCA's factual determination that trial counsel settled on the sentencing-only trial strategy only after discussing that strategy with petitioner and obtaining petitioner's consent to proceed with that strategy, <u>see</u> Dkt. # 9-2, Tr. Trial vol. 1, at 27-32.

For these reasons, § 2254(d) bars relief on the portion of claim three challenging trial counsel's strategic decision to advise petitioner to concede guilt at trial and argue for a lenient sentence.  The Court therefore denies that portion of claim three.

---

[12]   Petitioner does not mention the OCCA's decision in his petition in his discussion of claim three.  Dkt. # 2, Pet., at 22-24.  In his reply, petitioner does mention the OCCA's decision, but only in the context of his unexhausted mitigation-evidence argument.  Dkt. # 11, at 7-8.

### *CONCLUSION*

After careful review of the record and consideration of the parties' arguments, the Court concludes that petitioner has not shown that his custody under the challenged state-court judgment violates the Constitution or federal law.  28 U.S.C. § 2254(a).  The Court therefore denies his petition for a writ of habeas corpus.

### Certificate of Appealability

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A district court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When the district court rejects a petitioner's constitutional claims on the merits, the applicant must make this showing by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Because the Court finds that reasonable jurists would not debate the correctness of its assessment of petitioner's federal claims, the Court declines to issue a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.    The Clerk of Court shall note the substitution of Scott Crow in place of Joe Allbaugh as party respondent.

2.    The petition for writ of habeas corpus (Dkt. # 2) is **denied**.

3.    A certificate of appealability is **denied**.

4.    A separate judgment shall be entered in this matter.

**DATED** this 18th day of September, 2020.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE